Jordan Graves
_____
Name
4826 Calle Bella Ave
_____
Las Cruces, NM 88012
_____
Address

FILED
U.S. DISTRICT COURT
DISTRICT OF NEW MEXICO

2024 OCT -9  AM 9: 30

CLERK-LAS CRUCES

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

Jordan Scott Graves , Plaintiff
(Full Name)

v.

Santa Fe
Community College , Defendant(s)

CASE NO. _____

(To be supplied by the Clerk)

CIVIL RIGHTS COMPLAINT
PURSUANT TO 42 U.S.C.§1983

## A.   JURISDICTION

1)   Jordan Graves , is a citizen of New Mexico
        (Plaintiff)                                  ( State )
who presently resides at 4826 Calle Bella Ave
                              (Mailing address or place of confinement)
Las Cruces NM 88012 .

2)   Defendant Santa Fe Community College is a citizen of
                   (Name of first defendant)
Santa Fe, New Mexico , and is employed as
          (City, State)
N/A . At the time the claim(s)
   ( Position and title, if any)
alleged in this complaint arose, was this defendant acting under color of state law?
Yes ☐      No ☒    If your answer  is "Yes", briefly explain:

3) Defendant _____ *N/A* _____ is a citizen of
(Name of second defendant)

_____ , and is employed as
(City, State)

_____ · At the time the claim(s)
( Position and title, if any)

alleged in this complaint arose, was this defendant acting under color of state.

Yes ☐    No ☐    If your answer is "Yes", briefly explain:

(Use the back of this page to furnish the above information for additional defendants.)

4) Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3), 42U.S.C. §1983. (If you wish to assert Jurisdiction under different or additional statutes, you may list them below.)

## B.  NATURE OF THE CASE

1) Briefly state the background of your case.

I was discriminated against and harassed for being African American by my supervisor Ms. Annette Baca. The organization did not help me when this harassment was reported. I was told harassment was OK by HR, and that I would have to deal with it. I was instead punished by HR, at the request of this supervisor, without any communication to me of any work performance issues. My coworker under the same supervisor, and equivilant title and experience, did not receive the same treatment. (She was a different) race

XE-    2/7    -2-

## C.  CAUSE OF ACTION

1)  I allege that the following of my constitutional rights, privileges or immunities have been violated and that the following facts form the basis for my allegations:  (If necessary, you may attach up to two additional pages (8 1/2" x 11") to explain any allegation or to list additional supporting facts.

A)(1)  Count I:  Title VII of the Civil Rights Act of 1964 has been violated. I was spoken down to in a racially derogatory manner and harassed. I reported the discrimination to HR, however received no assistance. I was instead punished at the request of the racist supervisor and forced to do a constructive discharge.

(2)  Supporting Facts:  (Include all facts you consider important, including names of persons involved, places and dates.  Describe exactly how each defendant is involved. State the facts clearly in your own words without citing leagl authority or argument.)

J.G.

N/A

Please see the attached documents for supporting facts.

A13 - A20  Complaint filed with HR

A21 - A23  One of the witness statements

A24  EEOC right to sue

A1 - A7  Statement on effort to resolve matter with HR.

A8 - A12  Statement on effort to keep job and reason for constructive discharge.

B)(1)  Count II:

N/A

(2)  Supporting Facts:

N/A

C)(1)  Count III:

N/A

(2)  Supporting Facts:

N/A

D)  PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

1)  Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action or otherwise relating to the conditions of your imprisonment? Yes ☐     No ☒      If your answer is "YES", describe each lawsuit.  (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

   a)  Parties to previous lawsuit.

       Plaintiffs: _____ N/A _____

       Defendants: _____ N/A _____

   b)  Name of court and docket number:

       N/A

   c)  Disposition (for example: Was the case dismissed?  Was it appealed?  Is it still pending?

       N/A

   d)  Issues raised: _____ N/A _____

e) Approximate date of filing lawsuit: _____N/A_____

f) Approximate date of disposition: _____N/A_____

2) I have previously sought informal or formal releif from the appropriate administrative officials regarding the acts complained of in Part C. Yes ☐ No ☐ If your answer is "Yes", briefly describe how relief was sought and the results. If your answer is "No," briefly explain why administrative relief was not sought.

N/A

E.    REQUEST FOR RELIEF

1) I believe that I am entitled to the following relief: - **Equitable relief.** Reinstatement of position in a non discriminatory environment and/or

- Lost wages, front pay and back pay
- Compensatory damages, pecuniary and non pecuniary
- Punitive damages
- Any attornees fees and costs

_____          _____
Signature of Attorney (if any)              Signature of Petitioner

Attorney's full address and telephone number.

Jordan Scott Graves
4826 Calle Bella Ave
Las Cruces, NM 88012
575 - 639 - 6678

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the plaintiff in the above action, that he has read the above complaint and that the information contained therein is true and correct.  28 U.S.C. Sec. 1746.  18 U.S.C. Sec. 1621.

Executed at ___4826 Calle Bella Ave___ on ___10/09___ 2024.
        (Location)                              (Date)

___Las Cruces, NM 88012___

_____
        (Signature)

A1

August 21st 2024

To Whom It May Concern,

My name is Jordan Graves. Here are my statements regarding my efforts to resolve the matter prior to resigning. It has become apparent that several situations were not handled correctly by SFCC.

In short, I was told by the SFCC HR department to wait until my probationary period ended to file the written report of harassment, because I would be in a safer position to defend myself against the discriminatory supervisor as a permanent employee. The HR department also told me I could protect myself by resigning to avoid giving the supervisor the opportunity to terminate me, which would reflect negatively on my record.

Below is a more detailed description of the communications that took place between myself and human resources.

In early May, I reached out to the HR department at SFCC (Steven Fresquez, Employee Relations Manager) to ask for help on how to deal with the discriminatory supervisory, as I was overwhelmed and needed guidance in the matter. The physical and emotional impact had been increasing over time during the past several months dealing with the harassment from Ms. Baca. I was beginning to lose the ability to cope and needed to contact someone for help. I started to notice the treatment from Ms. Baca was now affecting my health, and ability to work effectively in a dignified manner, without fear of hostility or retaliation from my new supervisor Ms. Baca. I reached out to the HR department, because I was feeling isolated and targeted in the situation, and was unsure of how to proceed in the hostile matter.

I clearly told Mr. Fresquez how my supervisor was treating me during the past several months, and that it was causing me a large amount of stress and asked how I should handle this situation with Ms. Baca. It took courage for me to finally reach out to HR. In the beginning of the conversation, I felt uneasy about reporting the abuse using  the names of the people involved, therefore instead I used hypotheticals with Mr. Fresquez. I had been dealing with a bully who had been discriminatory for the past several months and was feeling intimidated and overwhelmed. I told Mr. Fresquez, "hypothetically if a supervisor was being discriminatory towards an employee in such a way,

what would be the proper steps to take for the employee to address the matter?" Mr. Frsquez stated that the supervisor's behavior in this situation was not in line with SFCC's code of conduct. As the conversation went on, I began to feel less isolated and more trusting and safe with Mr. Fresquez. I eventually opened up to Mr. Fresquez and told him, the abuse I had been describing hypothetically, had actually been happening for the past several months, and my new supervisor Ms. Baca was the one discriminating against me. I now transitioned my questions from how the situation should be handled hypothetically, to asking directly how I should handle the situation. I was not knowledgeable on the HR practices of SFCC and I wanted to do things the right way.

Mr. Fresquez clearly stated that he had never met Ms. Baca and didn't know who she was. I asked Mr. Fresquez about what the proper way to handle the situation would be. Mr. Fresquez told me that in the past at SFCC, supervisors who have been reported by their subordinates will always turn it around, to blame the subordinate instead. Mr. Fresquez stated that I am close to my one year probationary period ending, and instructed me to wait a few weeks until I become a permanent employee then go through the written processes of reporting Ms. Baca, and attempting to find a resolution. Mr. Fresquez stated waiting to report the discrimination would keep me safe from retaliation from Ms. Baca. Mr. Fresquez also gave me the option of resigning. He said this would prevent Ms. Baca from being able to terminate me, which would cause me to have a termination on my record when I'm looking for other jobs. I began to feel Mr. Fresquez had my best interest in mind with the advice he was giving me. I now trusted Mr. Fresquez and followed the instructions he told me and waited to report the discrimination until after my one year anniversary.

After this meeting, I now waited anxiously for my anniversary date, because the treatment from Ms. Baca had become unbearable. It did not sit well with me, that I would have to endure a few more weeks of the abuse from Ms. Baca, however I was doing what the HR department told me to do.

Today, as I look back on my interactions with the HR department, I see a pattern of being misled by inconsistent, unreliable, and false information. These events between myself and the HR department will expose that I was effectively forced out of my position with SFCC, and given, in essence, no support in dealing with the discriminatory abuse that was occuring. Here are additional details on my meetings with the HR department after I initially communicated the discrimination.

A3

June 3rd: After receiving notice from Ms. Baca of the meeting with HR scheduled for June 13th, I reached out to Mr. Fresquez (someone I trusted), and told him I had been asked by Ms. Baca to book a trip to Santa Fe on short notice. I asked Mr. Fresquez if he knew what the meeting could be for. My Fresqez said he had no knowledge of the meeting being scheduled, and that he had no idea what it could possibly be about. He told me that SFCC policy is for the supervisor to communicate any work related issues to the subordinate, to give them a chance to improve, before going directly to HR. I left this meeting with Mr. Fresquez without answers and feeling very uneasy.

June 10th: I reached a breaking point and submitted my resignation. I called Donna Castro (Director of HR) minutes before resigning. She did not answer my call, however called me back shortly after I resigned. I asked if she could confirm that the meeting on June 13th was scheduled to prevent me from becoming a permanent employee. Ms. Castro said yes, that was the purpose Ms. Baca had scheduled the meeting, and that Ms. Baca said her reason was my work performance and setting expectations. I told Ms. Castro that Ms. Baca had never communicated anything to me regarding my work performance or what her specific expectations for me were, prior to this meeting. I asked Ms. Castro, if I could prove that I had been doing all my work, and that any work left undone was a result of Ms. Baca refusing to give me the approvals that she required I ask of her, which would allow me to proceed with my work. Ms. Castro said it wouldn't matter what I could prove, and that it would be up to the discretion of the supervisor. Ms. Castro recommended I request to rescind my resignation. I asked how that process would work. Ms. Castro said Ms. Baca would be the one who would have to approve the rescinding of my resignation. Given the ongoing abuse by Ms. Baca towards me, I was filled with anxiety on the day I resigned. I may not have been making the most well thought out decision, however abuse over time can become overwhelming. I strongly wanted to keep my job at SFCC or work another job at SFCC, as long as I no longer would be discriminated against. I felt that if the person who would be in charge of approving my reinstatement was the discriminatory supervisor, that this would not be a viable option. Especially since I had already communicated the abuse to HR and it had apparently fallen on deaf ears.

I was told by HR on June 10th that I would have some time to think about if I wanted to request to rescind my resignation. I told HR that morning that I would think about whether I wanted to request to rescind and get back to HR. However the next morning my computer was disabled and I was told to return it. In the days after resigning, I reviewed the SFCC policy and procedures and discovered the President is the one who approves

resignations reinstatement requests. If I had known the President was the one who approves reinstatements, not the supervisor, as I was misled to believe, I would likely have requested to rescind on the day I resigned. I would have felt more assurance that the discrimination issue would be addressed if I knew the president was the one to review the reinstatement requests. I did not understand why Ms. Castro had said supervisors are the ones who approve reinstatements, when the SFCC policy states otherwise.

If the SFCC HR department and Mr. Fresquez claim these conversations were not had, they would be fabricating the truth. Thankfully there are recordings and witnesses.

Due to the secretive and demeaning nature of Ms. Baca's communication with me, early on I got in the habit of documenting events that occurred with Ms. Baca, and recording conversations I had with her. In one conversation that was recorded, it can clearly be heard that I, in a professional and friendly manner, am communicating to Ms. Baca, that I value receiving feedback on my work, and am requesting for her to give him any necessary feedback if there are areas where I can improve. In the recorded conversation, Ms. Baca simply dismisses my attempt to communicate and ends the call, even after being asked multiple times for feedback, by me.

This conversation is an example of how Ms. Baca had a pattern of refusing to communicate effectively and professionally with me. Evidently she was a very active communicator, however it was done secretively to her supervisor and the HR department, where apparently she spent a good amount of time conniving to sabatosh my work in their eyes. Ms. Baca would frequently speak down to me, like I was an inferior person, and demand that no decision be made by me, even the smallest, without her approval first. Because of this, I got in the habit of requesting approval from her on everything before proceeding. I, however, would often not receive a response from Ms. Baca, even after repeated requests for guidance or approval.

It's now clear that one of the games Ms. Baca was playing, was to make it very hard for me to do my job by ignoring me, and then secretly portraying to others in authority positions that I am not doing my job. Fortunately, the emails and conversations detailing this ongoing pattern of Ms. Baca have been saved. These saved records show that clearly Ms. Baca was conniving behind the scenes to undermine my work, purposely not communicating with me, and effectively forcing me out of my position at SFCC.

A5

I had made multiple attempts to establish communication with the HR department, however the HR department and SFCC has made it clear they are not interested in having me be employed with them and ensuring the work environment is safe. SFCC is trying to clean up after that fact to make up for the huge mess that was created by dysfunctions within the HR department and the organization itself, which allowed a situation of discrimination to be inadequately addressed. I should not have to pay the price for the organizational failures of SFCC. SFCC's incompetence and lack of concern for my discrimination reports, forced me to do a constructive discharge. I was left to be isolated in my struggle with the harassment, and to find a way to deal with the discrimination on my own.

I am currently filing a lawsuit with the district court and do not want to continue to be discriminated against working at SFCC while the legal process occurs. I would love to work for SFCC, if the conversation about how to ensure a safe working environment can be had. Not one single person at SFCC has reached out to me to help me maintain employment and with genuine concern for the situation. Mr. Fresquez has reached out to gain additional details for his investigation, however none of this helps my circumstance. I am willing to work with the organization, to bring me back to work, however they are unwilling to work with me.

The nuances of HR practices and how to handle discrimination are outside of my area of expertise. I am trained in accounting. I also do what I am told by those in authority, and that is what I did while working at SFCC. SFCC failed me, with regards to a sensitive matter of discrimination and this has impacted my overall health and career negatively. It's unfortunate that I have to spend time and effort trying to get a resolution to this matter. The responsibility lies solely on the shoulders of the HR department, the organization, and the supervisor. I did my part, which was to perform the duties outlined in my job description, perform what is asked of me by my supervisor, and to report abuse and follow the instructions given to me by HR. That's exactly what I did.

An interesting question I would like to ask is why was I given about one week's notice to scramble to make a trip to Santa Fe, to receive a probation extension? It's been reported by multiple SFCC employees, including members of the HR department that such a policy was not being enforced at the time I was employed, and had not been used on any other employee in years, and that meetings were had by HR after my departure to make it look at if this policy was being enforced prior.

I would like to quickly describe the environment in the grants department when I arrived, to give some context, and to reveal the widespread chaos that was

A6

occurring, in an organization, likely looking for someone to blame. I was put in a very difficult situation because I was hired in a department (grants department) that was understaffed. There was no long standing staff once the prior director (Ms. Hernandez) left in November 2023. Everybody in the grants department was new. The new supervisor Ms. Baca was hired hastily in January 2024, while the rest of the grants department staff, Ms. Benevidez and I were hired in June of 2023. To quote Ms. Pell (head of the entire finance department) the situation in the grants department prior to my arrival was "a mess." Files could not be found, procedures were not being enforced correctly, and huge amount of knowledge specific to each grant was lost after the departure of the original supervisor Ms. Hernandez. The software was also new, creating huge organizational challenges. The grants department itself was in widespread disaster at the time I was hired. They were clearly looking for people to rescue the situation. Things such as having grant contracts in files that could be accessed were not even being done when I arrived. These factors were not mentioned in the job description or in the interview when I was hired. The task ahead was larger than expected, however, with a positive attitude I committed myself to the challenge of getting things done the right way, collaborating with the staff, and following instructions given. There were additional challenges I realized I would have to face, even before the discriminatory supervisor was hired. Regardless, I took on these challenges as I am a very motivated person.

Since my departure, I have communicated with each of the grantor agencies I was responsible for working with. To include Federal, State, and Local agencies. Each of them has told me my work was exemplary and above that of my peers or predecessors. To this day I still do not know what the extended probation based on my work performance was about. Because my supervisor never communicated it with me. The scheduling of this short notice, extended probation meeting was very impactful to me, as it indicated my supervisor was not only discriminatory to my face, but was also conniving behind the scenes to make others in authority believe my work wasn't being done.

To sum up my above statements, I was effectively ignored, misled, and forced out of SFCC by the HR department and the organization.

I hope I am not faulted or penalized for resigning. I needed to make decisions to protect my health, my family, and my career. The instructions given to me by HR did not help me address the discrimination. I did not receive the appropriate support from the HR department when I communicated the abuse that was occuring, and in the weeks and months to follow.

A7

Please reach out to me if you would like any additional information or proof to support the above statements.


Respectfully,

Jordan Graves, MAcc
4826 Calle Bella Ave, Las Cruces NM 88012
575-639-6678

*AB*

Statement for 2nd Appeal

September 20, 2024

Higher Authority
PO Box 1928
Albuquerque, NM 87103

To Whom It May Concern,

Thank you for taking the time to consider my second appeal. I do not agree with the decision from my hearing on September 9th 2024, and would like to provide my clear and concise reasons why.

My main argument is, after I had first reported the discrimination to HR, as the employee I was given very specific instructions on what actions to take, to address the matter of the discrimination.  I followed these instructions given to me, however these instructions were not correct, and they did give me the tools and knowledge I needed to report the discrimination effectively. Infact, the instructions I was given only allowed the discrimination to get worse for me. And left me without an avenue to address the issue. My question is, what responsibility does HR take in this situation? Am I unable to receive unemployment benefits because I did not want to continue to be abused in an environment where HR was not providing a path for me to resolve the issue. I feel I took the correct steps by going to HR first with the issue. HR did not help me, but hurt me, so now I need to address the matter on my own and go to EEOC and district court. I also would also like to state, this is not just a matter of me having high anxiety. The environment created by Ms. Baca was very descrinitory and abusive, and this treatment was witnessed by many, who could not believe I was able to withstand the treatment for so long.

Respectfully, I would like to request my issue be remanded for another hearing, if possible. The reason for my request is that one of my witnesses was unable to attend. I had called the unemployment claims department a few days before the hearing to ask when the witnesses needed to be ready. They said the witnesses will be called after the hearing and interviewed by the judge, separate from the employer and claimant hearing. Therefore my witness was ready to participate for about 9am, when the hearing was scheduled to end. Ms. Bernal was not expecting the judge to ask her to be available at 8:15am. She was unable to participate. If another hearing is not possible, I do still want to submit the attached documents along with this statement for why I do not agree with the decision.

I would like to reference the wording from the conclusion on my appeals decision letter. The quote is below.

"Although the claimant's reason for submitting his resignation may have been for reasons constituting good cause connected with the work, the claimant failed to try and resolve his concerns with the employer prior to submitting his resignation. The claimant failed to file a

A9

formal complaint about the discriminatory treatment he endured from his immediate supervisor to give the employer the opportunity to try and resolve his concerns. Even though the claimant inquired with a Human Resources representative about how to address his concerns and was advised to wait until he was a permanent employee to file a formal complaint, the claimant could have elected to file a formal complaint immediately to give the employer the opportunity to resolve his concerns prior to submitting his resignation. The law is clear that when an employee has viable options available to him, his voluntary termination without exploring these options does not constitute good cause for obtaining unemployment compensation. Based upon the available evidence, it is concluded that the claimant failed to take the measures which a reasonably prudent person would have done to preserve one's employment."

The wording that stands out to me the most from this conclusion is "claimant failed to take measures that a reasonable and prudent person would have done to preserve one's employment." I believe this could not be further from the truth, as I believe a reasonable and prudent person would have reported the discrimination to HR, as I did, and followed the instructions of HR, as I did. I was not made aware of what the formal complaint process was or how to do it, on the day I originally reported the discrimination to HR. The knowledge of what the formal complaint process was told to me by HR on the day of my resignation, June 10th 2024. When I originally reported the discrimination in early May 2024, I was told to wait until my probation ended to file the report. I assumed this was standard practice for SFCC. I'm not an expert on HR, which is the reason I reached out to HR to receive guidance on how to address the discrimination. I later found out my probation was not going to be ending, at the request of Ms. Baca, and that HR was in support of Ms. Baca's decision to discipline me, that HR felt Ms. Baca's treatment of me was acceptable, and that HR was not going to hear my side of the story with regards to Ms. Baca's claim of "work issues." I believe a reasonable and prudent person would resign from their position, if they had reported abuse after several months to HR, and were not given a way to resolve it, but instead were given incorrect instructions by HR which put that employee in a position to suffer worse discrimination. It is my belief that a reasonable and prudent person who has been subject to ongoing racial hostility will remove themselves from that situation, if the institution can not provide an avenue to resolve. SFCC did not provide me this avenue I needed. I feel as if I am faulted for following the precise instructions given to me by HR and not enough consideration is being given to the impact of this situation from the employee perspective.

During my conversation with HR in early May when I first reported to discriminatory treatment to Steven Fresquez in HR, he did not make any mention of what the formal complaint process was or how I can do it. I was only told about the formal complaint process by Stephen Fresquez moments after I had submitted my resignation letter on June 10th 2024. Mr. Fresquez encouraged me to file the complaint post resignation, but never mentioned that this option existed or details of how to do it prior to me resigning. Starting from the time I reported the discrimination to Mr. Fresquez in early May 2024, he could have reached out to assist me and show me this formal complaint option, during the month after I reported the abuse.

A10

During the meeting with Mr. Fresquez I was clearly told not to report the abuse (note: no information on how to report the abuse was given). Mr. Frezquez has given me very direct instructions and told me to wait until I become a permanent employee after one year, to report the discrimination. He was so direct on the instructions for me, that he gave me a step by step process on what I needed to do. During the meeting, Mr. Fresquez told me to take detailed notes of my interactions with Ms. Baca between now and the time of my one year anniversary. He told me that I am to file a report after the anniversary date, and he told me to say exactly what I told him during the meeting (early May meeting). He told me to say how the discrimination made me feel in the report, and include the notes I had been taking. Mr. Fresqez said waiting until after my anniversary date when I become a permanent employee would protect me from retaliation from the discriminatory supervisor. Mr. Fresquez said supervisor's usually retaliate in situations like this where the subordinate is reporting the supervisor. Mr. Fresquez indicated I have a better chance at keeping my job if I wait to report the discrimination once I have perm status with SFCC. In the interest of keeping my job and following HR's instructions, I did exactly what Mr. Fresquez told me. I really did not want to lose my job. I also did not want to experience additional racial hostilities from Ms. Baca.

I followed the step by step instructions Mr. Fresquez gave me the day I reported the abuse to him. The communication from this meeting was well documented and witnessed. Mr. Fresqez also told me to resign to avoid being terminated.  I did not understand why he would tell me to resign, when the idea of leaving a great job with great benefits just because of one racist person seemed like it would be a very poor choice, as I sought to resolve the issue internally and keep my job. I did not show much interest in resigning when he mentioned it. I followed the step by step instructions Mr. Fresquez had given me, which he indicated would help me keep my job and successfully resolve the issue internally.

I never got the opportunity to file my report on my anniversary date, because Ms. Baca had gone to the head of the finance department (Amy Pell) and the director of HR (Donna Castro) and lied about my work being poor and got the approval to extend my probation. Keep in mind this extended probation did not occur for my coworker, Carla Benevidez, who was also supervised by Ms. Baca, and hired on the exact same date with the exact same job title as me. Also, it should be noted that there was zero communication by Ms. Baca to me with regards to work expectations or work performance issues. All of this was done behind the scenes by Ms. Baca.

In mid to late May 2024 (after I had initially reported the harassment) I met with Mr. Fresquez to inquire about signing up for health insurance, and to ask about the benefits. During that meeting I brought up the issue of the discriminatory supervisor again to Mr. Fresqez to see if he had any further guidance, as he had not made me aware of the formal complaint process yet, and had instructed me to wait until my probation period ends to report to discrimination. To my surprise, during this meeting Mr. Fresquez' tone had changed drastically. He told me he felt Ms. Baca's treatment of me was ok, and that I needed to just deal with it, and that she has not violated the code of conduct, and that is just how she is. This was very shocking to me, as I could see he was Mr. Fresquez i.e. HR was no longer interested in my report of discrimination,

All

and was now in defense of Ms. Baca. This was a 180 degree shift from his tone, when I originally reported the discrimination in early May.

I would've like ask Mr. Fresquez how he would feel if he was ignored by his supervisor when he spoke up in meetings, as if he wasn't even there, if any issue with the new software we pinned on him as his fault by his supervisor, if he was publicly told he was stupid in group meetings and spoken to like a child and routinely scolded, if any time he asked for guidance from his supervisor he was told he's a problem causer and the question disregarded, if his supervisor lied to their supervisor and said he wasn't doing his work, if time off request were denied without reason, if he was punished for working overtime to complete projects, and he was told he didn't have the skill and competence to perform his job on a regular basis, and meeting with HR were scheduled to discipline him. And on top of this, if his colleagues were treated completely differently by the same supervisor. Mr. Fresquez was aware of this treatment, so it appears he believes this is acceptable treatment from a supervisor to a subordinate.

By the time the meeting to extend my probation was scheduled, I could now see HR and upper management had no interest in my report of discrimination, and instead were interested in disciplining me, based on the blind trust in the lies of Ms. Baca. The abuse I'd been suffering since January, was now only going to increase, because now Ms. Baca would have upper management and HR supporting her lies about my poor work performance. I had nobody on my side now. I thought HR was my only resource to resolve this issue. I did not want to put up with this abuse any longer, especially since HR proved that they are not a resource for me.

On the day of my resignation, I brought up the discrimination again to Mr. Fresquez and Ms. Castro. Finally, on this day, I was told how to file a formal complaint. I was told to file the complaint post resignation. Ms. Castro said whether I was doing my work or not didn't matter and that Ms. Baca had the freedom to discipline me as she pleased without needing to communicate anything with me regarding my work performance, or needing to follow any formal processes for addressing employee performance. I asked Ms. Castro if I would have the opportunity to prove that I had been doing my work. Ms. Castro outright told me that my voice did not matter in this meeting to extend my probation and would not be considered. Ms. Castro then made an insincere offer, and advised I request to rescind my resignation. Ms. Castro said Ms. Baca would be the one in charge of approving my request. I said I wouldn't want to request to rescind if Ms. Baca is the one to approve, as this would put me in an uncomfortable situation, because of the ongoing harassment. I was very emotional that day, and said I would think about it and get back to her. In the weeks to follow, I found out this was untrue, as the President is the one responsible for approving rescinding of a resignation according to SFCC policies and procedures. Ms. Castro was aware of my report of discrimination, therefore, her telling me Ms. Baca would be the one to approve the request, seems unprofessional. Had I known the President approves these, I would have felt much more confident that my issue would be taken seriously and reviewed. My computer was disabled the next morning and I was told to return it, as Ms. Castro had given me little time to consider requesting to rescind. It showed me she was not being sincere.

A12

I'd like to point out that the last thing I wanted to do was resign from my position, as I loved my job. I committed an entire year of my life to becoming an expert at the position so I could exceed it. However I did not want to continue to work in an discriminatory environment, where HR is not providing an avenue for resolution, and the harassment was only getting worse.

The reason I filed for unemployment was so that I could be able to afford food, my bills, and a place to live, while I look for another job, and use the resources available to me to address the situation. I have currently filed a charge with the EEOC and the NM Human Rights Bureau and am in the process of filing a lawsuit in district court. I did not want to continue to suffer this abuse during the legal process, which can be lengthy. Dealing with Ms. Baca has cost me my job and left me with the daunting task of reporting the discrimination to the appropriate agencies, since the HR department at SFCC did not provide me an avenue to resolve it, and in fact did the opposite by disciplining me.

The lies from Ms. Baca can very easily be exposed, as I could see what her lies were and how she was manipulating upper management and HR. It was clear as day.  I could have explained this easily if anyone was interested in hearing from me. Nobody reached out to me to discuss what my work issues were, not Amy Pell, not HR, and not Ms. Baca. I was kept completely out of the communication loop. And again, as Ms. Catro stated my word would not he heard with regards to my work performance.

My apparent poor work performance was in stark contrast to the praise I'd been given by Amy Pell, and multiple members of SFCC, prior to Ms. Baca being hired. I was routinely thanked by SFCC staff for helping take charge to rescue the grants accounting department which was struggling with the software conversion and with being understaffed. The narrative of me being a "problem employee" only started the day Ms. Baca was hired  in January 2024.

Several of SFCC staff including directors of the various grants I was responsible for along with our contacts for grants SFCC was issued by State and Federal agencies told me Ms. Baca's treatment of me was discriminatory, and that I should report it to the EEOC or NM labor relations. These individuals who witnessed or heard about Ms. Baca's treatment of me, came to the conclusion that this is obvious discrimination, with me even mentioning the word.

In closing, I disagree with the decision from my September 9th 2024 hearing which referenced Section 51-1-7(A)(1) of the Unemployment Compensation Law of New Mexico. I feel a key issue is what a reasonably prudent person would have done to preserve employment. My goal all along was to keep my job and this is what I tried to do. It was one of the best jobs I'd ever had. However, I will not allow myself to be abused. The details of my issue I feel should be reconsidered. Thank you.

Respectfully,

Jordan Graves
575-639-6678

A13

June 20th, 2024

HR Department
Santa Fe Community College
6401 S Richards Ave
Santa Fe, NM 87508

To Whom It May Concern,

I would like to report racial discrimination from Annette Baca, which is the reason for my resignation, on June 7th 2024. This discriminatory behavior was witnessed by others at SFCC, and began occurring from the very beginning when Annette was hired. Other SFCC employees saw a pattern of harassment and bullying from Annette towards me and advised me to say something to her supervisor or HR. I regret not reporting this early on, when Annette was hired, thinking that by being extra friendly to her, and doing everything she asked, I could improve the situation. I was wrong, as things did not improve over time, and the discriminatory behavior from Annette continued for months, while I was working as a grants accountant.

Another reason I did not report this early on was, I thought, because everyone in the grants department was so new, and learning the new Workday software, perhaps it would not be timely to address this issue.

I want to mention, I am an African American person who has had a challenging background, and has had to work hard to be successful in my life. The respectful and dignified treatment of people is a top priority in my life. I've had the opportunity to embody these values in the past when I worked at a homeless shelter, served in the military, and grew up in Seattle where I was in the minority racially.

Lastly, I want to state, my report of discrimination occurring has nothing to do with SFCC or my former colleagues, as I have had nothing but kind, respectful and supportive interactions with my coworkers, management, and all of the staff I worked with. I truly loved my job and will miss the collaborative environment at SFCC. My report of discrimination is specifically from Annette Baca. My report of discrimination occurring is based on the events which unfolded during my time at SFCC, personal life experiences, and also from reading the SFCC Discrimination and Harassment policy 4-9, along with having taken the harassment training at SFCC. These events I have experienced are clear violations.

I believe Annette was discriminating against me based on race, due to the following reasons.

A14

In February 2024, shortly after Annette was hired (late January 2024), Annette believed I was two pennies off in my calculation of how much we owed a grantor (VLP grant). I attempted to show her my reconciliation multiple times so she could see where the two pennies came from, as I had worked on the grant for six months previously and had considerable knowledge of the transactions. She maintained that because of my inherent incompetence and lack of understanding for how grants work in general, I must be wrong. I thought her accusations were odd, because she had just met me and didn't know me well enough to know my level of competence or how well I understood grants.

In February 2024, Annette would refer to me in group meetings as "the problem" and the one who always causes problems. There was no basis for this accusation. It was just her opinion of me, and how she would refer to me going forward privately and publicly. After this meeting, others who were present, mentioned to me that I was being singled out and targeted by her, and that she had an issue with me, that was not based on my work or conduct, and that I should bring it to the attention of her supervisor or HR.

On March 20th 2024, we had a group meeting to discuss financial aid reconciliations. We were discussing why the drawdowns generated from our reconciliation report were not always matching the amount available to draw in G5 and the amount on Harrison's COD report. The financial aid reconciliation process was something the whole grant department was learning. The difference in balances was caused by a timing issue. In the meeting Annette stated, "leave it to Jordan to always be the one causing confusion." This became another one of her ongoing attitudes towards me. For months afterwards, Annette would refer to me as the one who "causes confusion."

On April 8th 2024, in a group meeting, Annette began discussing a balance of about $5k that was sitting on one of the expired AE grant ID's from the prior fiscal year. The AE grants were part of my grant portfolio. Instead of asking me what the balance was, or if I could fix it, she continued to discuss the problems created by the balance on this grant ID, as if I wasn't even there. I patiently waited to see if she would address me directly, however she went on to say, "Jordan's just sitting there quietly, thinking to himself, I don't know nothing!" Annette said this statement is a racially derogatory accent. I resented her racially discriminatory language and tone used, and attempted to steer the conversation in a more professional direction by stating what needed to be done to correct the $5k balance. Note, she still had not addressed me directly by this point.

On April 8th 2024, we had our weekly grant team meeting. I told Annette I planned to use most of this week to work on preparing the March billing for the AE grants. I told her this is going to be very time consuming because I will need to reconcile many payroll accounting adjustments from the prior periods to have the reports balance, before I submit them to the grantor. This was caused by other departments at SFCC allocating salary expenses to last year's grant ID's, as each of the different departments were still learning how allocation in the new software works. In other words I would need to clean up the mistakes on the back end and reconcile the billing before sending it to the grantor. Typically the billing would only take an hour

A15

or so to prepare for each of the AE grants. However this process would take days when reconciliation was needed to account for these adjustments. I had communicated the time it takes to prepare the billing for AE to Annette clearly, in the months prior also. She was aware of how long this process takes when there are prior period adjustments to capture.

Annette told my coworker and I to drop everything we were doing that week, to help her report the current and projected budgets for all of the SFCC grants by a deadline of Friday, to Amy Van Haas, who will report them to the State of New Mexico. I told Annette, since this was the time I had planned to work on the AE grants, I will need to work extra hours to submit the billing to the agency by Monday the 15th, as they had requested in an email. Typically AE gave extensions, but this month they were strict. Annette approved for me to work Saturday and Monday after 5pm. I worked very hard, and was able to submit the billing on time. I worked Saturday and even worked until 10pm on Monday, five extra hours. On April 18th, Annette asked me to have a meeting with her. In this meeting she asked me, "Why is your work taking you so long? It shouldn't take you so long, you're making things more confusing than they need to be, and you shouldn't have wasted five hours doing useless research on Monday."

I was completely shocked by her statement, and actually thought the meeting was to commend me for my hard work. I also was shocked she would accuse me of wasting time doing research after hours, when she could see all of the work being submitted to the grantor via email, and can likely track my activity in Workday. On top of this, she had no real understanding of how long it takes to reconcile and prepare the billing, because she had never done it herself and had only worked two months for SFCC. She was, however, sure that by me working extra hours, I had done something wrong and that it was my fault. Her tone in the meeting suggested I was intentionally not doing what I was supposed to during working hours, and then wasting time after hours.

I was also shocked by her accusation, given the fact that I had dropped everything I was doing last week, to help her with her own project. I thought she would be grateful for this. I felt so upset after work that day, I could not sleep, and felt awful the entire next day at work. I could not believe that I had worked my hardest for a week straight plus extra hours, to the point of exhaustion, and then was scolded by Annette.

Despite her bizarre accusation, I made sure in the months following to prepare the AE billings one week earlier than normal, to make sure I could easily submit them before the deadline on the 15th. I vocalized this adjustment to my work routine to Annette clearly, multiples time in our weekly grant team meetings, and privately,

I want to mention that these frequent, demeaning exchanges with Annette, made it feel as if I was walking on eggshells, and couldn't ask her basic work related questions, without being spoken to abusively. It created an unsafe environment.

I also want to stress the derogatory tone Annette used in all of these interactions with me. The tone she used was very impactful,, as were her choice of words.

On April 30th 2024, in a meeting with Annette, I asked if she could confirm that she wanted journal entries done for adjustments to payroll transactions before 12/31/23 and payroll accounting adjustments done for transactions after 12/31/23, as she had mentioned this

previously. She responded very angered and annoyed and said, "Just do it all as a journal entry! You're getting way too confused." Later, in the same meeting, I mentioned to her that the journal entry for the payroll transaction would be extremely detailed and large and asked how she preferred for it to be entered in Workday. She responded, again very annoyed and angry. "Jordan, you're just making this so much more confusing than it needs to be and creating extra work!" She then proceeded to show me a way to shorten the entry using a pivot table.

I felt very degraded and dehumanized after this exchange, and wondered why she couldn't just say, hey Jordan I know a faster way we can do this, let me show you how to create the journal entry using a pivot table in excel.

On April 30th again, Anette and I had a meeting with our contacts for the Plutonium grant. There had been weeks upon weeks of back and forth emails with the grantor, for an invoice needing multiple corrections. This was caused by the PI's allocating some non allowable charges to the grant, and the grantor incorrectly saying we can not include tax as part of the reimbursement for lodging according to the Federal Travel Rates. There were a myriad of other reasons causing corrections to be needed on this invoice. To note, the date of the invoice was never mentioned as an issue during the weeks of email exchanges. The Plutonium grant was new, and SFCC along with Shannon Flynn (Plutonium contact), were both learning the process of billing together. During the meeting we sorted out the issues. At the end of the meeting Shannon mentioned a minor issue was to change the invoice date from the date of the month being invoiced, to today's date.  I said, thank you Shannon, I'll go ahead and change the date. Once the meeting ended, Annette met with me individually, and stated, "See Jordan because you had the invoice date incorrect, you caused this invoice to be held up for months. I felt sick to my stomach as we were both aware of multiple errors from all parties involved, however she chose to pick one issue, and place the blame solely on me. I felt targeted, bullied, and dehumanized by Annette, as she is the person of authority.

I want to mention, despite the terrible impact of all of these interactions with Annette, I respected her Authority, and remained professional.

Because this discriminatory pattern of treatment by Annette became routine, over the course of several months, I began to feel loathing for the next time I would have to interact with her. I decided if I just be professional and do my work, things will be fine, as I love my job, the organizations, and have positive interactions with everyone else I work with, and plus I don't have to interact with Annette too frequently.

I reached out to the HR department in early May and had a conversation to express how Annette had been treating me, how it made me feel, and asked for advice on how to handle the situation, as I was very overwhelmed emotionally by Annette treatment, despite my best efforts to remain professional and do my work. The HR department advised me that Annette's behavior, which I was describing, was not in line with the SFCC code of conduct. The HR department mentioned it might be good to wait until my 1 year probationary period ended on June 26th, before taking action to submit a complaint or address the issue. This was one of

several options recommended. I decided I would just work hard and then address the issue after my 1 year probationary period ended.

I'd like to mention that over the five months I worked for Annette, I went to great lengths to be overly welcoming and friendly to her. She also gave the impression that she didn't want any work done that was not approved by her, therefore I went above and beyond to make sure I asked her directly how she wanted things done specifically, on daily work tasks. For the reasons mentioned above, this was not always easy. I noticed that, no matter what action I had taken, even if it was the action she had requested I do, I would still be shamed by Annette, for having done the wrong action. As the months went by, it became clear to me, it's not my work or my conduct she has a problem with. She has a problem with me and who I am. I began to see, in her eyes, it's not that I've done something wrong, it's that I'm wrong - meaning me being who I am is wrong. In my fifteen plus year career working in accounting, never have I encountered this type of unprofessional and discriminatory treatment, in a work setting. This was clear racism. I know the feeling of racism, having experienced it before, in non work settings. It doesn't feel good at all. It feels like being invisible to another person and being regarded as "less than."

I want to note, numerous previous supervisors in my career have had just the opposite opinion of me, and have stated that I was a stand out employee who excelled among his peers, and should be rewarded and acknowledged. I have a long history of receiving performance based awards from my employers, throughout my career. Before the prior SFCC director of grants account resigned in November, she stated there were no issue with my work performance, and that I was very smart and learned well, and any time I didn't know something I reached out for clarification.

The ongoing pattern of toxic treatment by Annette, created a communication barrier and became overwhelming. By mid to late May, she had stopped replying to my emails with questions about the grants. I needed her to answer these questions so I could proceed with billing on each of these various grants. I would follow up on these emails, and ask again, if she could advise me in the right direction. Even after following up, I still received no response to any of the multiple emails I had sent. This went on for weeks. In one of our weekly team meetings, I verbally asked her the questions from my unanswered emails. One by one. She seemed annoyed, and dismissive of these questions, and stopped me half way down my list. She did not answer any of my questions in that meeting. It seemed that these questions were not important to her, and that me bringing them up was making her angry. Because of this, I could not move forward on the billing for several grants. It appeared that she was more interested in spending time meeting with my coworker.

On Monday, May 27th 2024, I requested again, through Teams, if Annette could meet with me to answer some questions I have about the grants. (My coworker was out this entire week). She did not respond to my Teams message, however she did schedule a time for us to meet, on Friday May 31st, which was on a day I requested to have off, and had checked in advance to make sure I had no meetings that day before requesting to use annual leave. I didn't mind working that Friday, but it seemed odd to me she would schedule the meeting at the end of the week, when she had free time available throughout the week on her outlook schedule. This would only further delay the billing for these grants.

To note, the grants I had not received email responses regarding were:

-UNIDOS STEM - how do we handle CBA?

-LANL - does she want the billing separated by semester?

-WIN - can we submit the payroll allocations to Barry for approval?

-Plutonium - can she confirm the amount I calculated for May projections?

-Perkins - does she want to meet to upload the budget in the OBMS system?

-ENLACE - can we discuss the budget overage or meet with Thomasinia?

-TRIO - can she confirm the IDC rate of 8%, she said prior it is 35% of salaries?

During this meeting, thankfully she did answer most of my questions, allowing me to proceed with the billing process. I was very relieved, happy, and thankful to be able to complete my work now. She stated during the meeting, "You're taking too long on all of these grants." Again I felt dehumanized, as clearly she had been ignoring my questions for several weeks, and I knew she was aware of this. At the end of the meeting, I tried to steer things in a more constructive, positive direction, and said "Annette, if there's any way I can improve or do things better, please let me know, I'm always open to feedback." I mentioned this, so that if she wanted me to improve something about my work, or there was a deficiency with my work, she could approach me directly and openly, with specific things I can improve, instead of saying general statements about flaws with me as a person.

I want to mention, I have prior colleagues at SFCC who can verify my history of good work ethic and professionalism. I can provide a list of these people.

It should be noted there was a clear pattern of different treatment from Annette toward me versus my coworker. This felt unfair, as my coworker and I were hired at the same time, we have the same job title, and had similar amounts of experience. Regardless, Annette, being the person of authority, treated us very differently. I did not notice the same pattern of discriminatory treatment toward my coworker, as had been directed toward me, by Annette. My coworker is of a different race and gender.

On June 3rd 2024, we had our weekly grant team meeting, with Annette, my coworker and I. At the end of the meeting Annette asked if I could stay on the call with her after. Now it was just the two of us. She said I needed to be in Santa Fe next Thursday June 13th, and asked if I could make the trip. I said yes, I can be there. The tone of her voice communicated it was urgent, and this meeting needed to be had, on emergency notice. I said I am available and can drive to Santa Fe next Thursday. She said there would be a hotel for me. I asked if the meeting was for a work project? She said no. I asked if it was something we could do over Teams, thinking to myself it would be almost a five hour drive to Santa Fe from Las Cruces. Annette stated, "I am uncomfortable doing it over Teams." I asked Annette if it was ok for me to know what the meeting was about. Annette simply stated, "we're not letting you go, and that the meeting was with HR." I asked if this was like a yearly evaluation meeting and if my coworker had to attend a similar meeting, thinking to myself, we were hired at the same time, therefore we would have yearly evaluations at the same time. Annette said my coworker did not need to come to Santa Fe, for she does not have one of these meetings, only I did.

A-19

This left me with two weeks to ponder what this mystery meeting with HR could be. Now in suspense and feeling very uneasy, I reached out to HR to ask if they knew what the meeting might be. HR said they had no idea, but it likely would not be a meeting relating to poor work performance as Annette had not once approached me in the past to discuss deficiencies in my work. HR said, the process for corrections to work performance would start with a meeting between the supervisor and employee. It would be out of the ordinary for a performance issue to come directly to HR before the work performance issue had been discussed with the employee first.

After much thinking, and doing some research, I concluded, Annette must be scheduling this meeting because she wants to extend my probationary period. She had to call the meeting on emergency notice because my 1 year anniversary was coming in a couple weeks, on June 24th. And I would be a permanent employee with SFCC. I later reached out to HR and confirmed that in fact this was Annette's intention for the June 13th meeting, to extend my probationary period based on poor work performance, and for her to "set expectations."

I found this June 13th meeting to be very disturbing as I had never been approached by Annette in the past, regarding any specific feedback on poor work performance, or any expectations she would like me to meet. I had never been approached by Annette in the past where she communicated what her expectations for me were. I spent much of the prior five months attempting to decipher what Annette wanted done, as she rarely spoke directly, she was more of a passive communicator, whose behavior was erratic and her moods changed frequently. At times I wondered if she had given directions of what she expected to my coworker and not me. Annette had spent a lot of her time at SFCC up to that point, mainly learning the new job. Interestingly, a lot of the time, my coworker and I were teaching Annette, because we had more knowledge as we were the only ones left in the grant department since the prior director had left. I should mention, having to ask me a question, I could tell was something Annette despised, and was a last resort for her. She always preferred to ask my coworker questions.

I was also disturbed greatly, because I take great pride in my work, and I had worked very hard for SFCC since the day I was hired a year ago, coming into a department that was understaffed, the entire college trying to learn a brand new Workday software, and having the prior director resign in November of 2023, caused my coworker and I to take on numerous extra duties outside of our job description, and essentially run the department on our own for a month. I had put my blood, sweat, and tears into learning this position and becoming proficient over the past year. Doing well in this position was something I took seriously and worked hard at. I was passionate about it. I know my work is good, as multiple employees at SFCC have told me, and the billing for all the grants had been submitted on time. The only grants being held up were the grants where Annette had been ignoring my questions. The apparent issues, whatever they were (because I am still unclear as to what they were) only began once Annette was hired. I found this emergency mystery meeting with HR to be emotionally overwhelming and humiliating, and this caused me to resign. The pattern of discrimination that had been going on during the five months prior from Annette towards me had begun to be more than I could handle. The ongoing dehumanizing treatment from my supervisor towards me, had taken its toll on my health, and is something that had affected me on a personal level.

I want to note, there are numerous additional events that I took detailed documentation of.

Unfortunately in my life I have experienced racial discrimination in the past, and can recognize it clearly when I encounter it. This was clearly racial discrimination. My previous experiences had been in non-work settings.

I will truly miss my former colleagues, as they were a joy to work with, and the reason I loved coming to work every day at SFCC. This was a tough decision for me to make, but had to be done for my physical and emotional health. I would like the opportunity to work for SFCC again some day if possible. I really would love to have my old job back, just with a different supervisor.

I would like a resolution in this matter.

Thank you for your time.

Respectfully,

Jordan Graves
4826 Calle Bella Ave
Las Cruces, NM 88012
575-639-6678

August 19th 2024

To Whom It May Concern,

Hello, my name is Melody Bernal. Mr. Graves and I worked closely together because I was his main point of contact for the Adult Education grants. Mr. Graves was responsible for fourteen AE grants, which made up most of his grant portfolio.

Mr. Graves communicated with me details of the interactions with Ms. Baca and details of his communications with the HR department during his time at SFCC. I would like to be very clear and specific as to the events that took place, and the compromised position Mr. Graves was put in. Keep in mind, one of the reasons Mr. Graves reached out to me was because he knew I previously had work experience in human resources, and he was looking for guidance. Please note, I am available to provide specific dates and any further clarification needed on the events I am about to describe. Please reach out to me on my phone number provided below for any additional questions.

I'd like to start off by saying this is not a story of a problem employee who was underperforming and not following the rules of the organization and authority figures. This is the story of an organization in disarray, a discriminatory supervisor, and a standout employee (Mr. Graves) who was left unsupported, and to fend for himself.

I am writing this letter on behalf of Jordan Graves. I would like to provide clarification with regards to Mr. Graves' efforts to resolve the discrimination involving his supervisor Mr. Baca. Mr. Graves did everything in his power to find a resolution to the matter. Mr. Graves stated to me that he had reached out to the HR department but was not provided with the support needed, even after multiple attempts by Mr. Graves to contact HR and find an avenue to resolve the matter. The HR department left Mr. Graves in a position where he would have to continue to be subjected to discriminatory treatment, despite expressing to HR that he needed help, and was under a lot of stress, resulting from several months of abusive treatment. Mr. Graves was a very hard worker. He was very passionate about his job and did not want to leave his position.

To this day, Mr. Graves stated to me he is willing to work with the HR Department to reinstate his position with accommodation made for the discriminatory supervisor. He is also willing to work in another department for SFCC, where he will not be subjected to discrimination.

Had Mr. Graves received the proper support from the organization, things would likely have turned out differently. Having worked for human resources in the past, I strongly believe Mr. Graves should not be expected to continue to endure discriminatory treatment. Mr. Graves should have received proper instruction and guidance on how to address the matter from the HR Department when he communicated the issue. The way the situation was handled by SFCC speaks to systemic failures within the organization itself. It also speaks to the motive of the organization. It is obvious the organization did not have a strong interest in providing a safe (nondiscriminatory) environment for Mr. Graves to work in by putting effort toward addressing his concerns and putting effort toward looking into the discriminatory events. Instead, the organization was more concerned about disciplining Mr. Graves. This systemic failure, on behalf of the organization, is shocking, given the organization's motto of "equity." Based on the events that unfolded regarding Mr. Graves, the

organization is not committed to equity, as they appeared not to have the resources or knowledge to handle an employee who is speaking up about being discriminated against.

Ongoing discriminatory treatment is a very hurtful and stressful situation for a person to experience, especially when it is from an authority figure, and the victim is not supported by the institution. The emotional impact can increase over time with a victim of discriminatory abuse, leading them to be filled with anxiety and have difficulty making sound decisions, as they begin to reach a boiling point.

I strongly disagree that because Mr. Graves resigned, he should be left without a path to resolution or recourse. No employee should be expected to endure an environment where they have reported discriminatory abuse to their HR department and are told to wait until their probationary period ends to file a report of the discrimination in writing, only to later find out that the HR department is extending the employee's probationary period, without any documentation or communication about any work performance issues. Mr. Graves stated on top of this, he was told by the HR department upon his hiring, that the probationary period and review process was not in effect and had not been for years. You can imagine the level of confusion and frustration Mr. Graves must have felt, as he had been attempting to seek clear guidance from the HR department regarding a situation of abuse. Mr. Graves is a professional accountant with a long career, a master's degree, and a CPA candidate. It is unfair for Mr. Graves to endure five months of demeaning treatment, and being spoken to like a child by the new supervisor? And then to be told by this supervisor that she's booking a hotel for him to make trip with one week's notice to meet the head of the finance department (Ms. Pell), the director of human resources (Ms. Castro), and herself (Ms. Baca), to discipline him and effectively take away the benefits Mr. Graves would have received by becoming a permanent employee.

I am confident this letter will shed light on the truth and clear up any misconceptions about what occurred while Mr. Graves worked at SFCC. In my opinion, Mr. Graves was subjected to hostile discriminatory treatment, and he did the right thing by trying to resolve the issue through the proper channels. Mr. Graves worked with the guidance he received from HR. It is difficult to fathom how poorly the situation was handled by the organization. Even after Mr. Graves' departure, the discriminatory supervisor would continue to blame him for completely outrageous and untrue things related to his work.

Several at SFCC witnessed Mr. Graves performing as a standout employee, who cared more than most, and was a model of professionalism and good work ethic. Others, including myself, would routinely reach out to Mr. Graves for assistance as he was knowledgeable and enjoyed helping. The news of his extended probation was beyond shocking to all those who worked with him, and was clear evidence that his supervisor (Ms. Baca) was colluding against him behind the scenes. I am confident that if you review the emails and recorded conversations between Ms. Baca and Mr. Graves, you will see the pattern of collusion.

It was very disheartening to see the abusive treatment towards Mr. Graves that began occurring at the start of Ms. Baca's hire. Others and including myself, were amazed that Mr. Graves was able to endure this treatment for so long, as we witnessed the extreme amount of unprovoked hostile treatment from this supervisor had for him.

It's sad to see discrimination in 2024, however unfortunately it is alive and well. I hope this letter shows that merely having a motto does not mean an organization is creating a safe nondiscriminatory place to work. Mr. Graves needs to receive recourse and a resolution for how he was treated and the events that unfolded at SFCC, so that he can continue his professional career, whether it is at SFCC or elsewhere. This situation has been very painful for Mr. Graves as he has never dealt with discrimination in his career until now and has had to figure out what steps he needs to take to deal with it. I wish the organization had properly assisted Mr. Graves, during this situation and after he reached out for help, however this did not occur.

Since January, Mr. Graves had exhausted every avenue with his prior supervisor to try to create an environment where he could complete his work without being harassed and be able to communicate effectively. Ms. Baca offered him no communication with regards to the quality of his work or what was expected of him. Mr. Graves would routinely reach out to Ms. Baca in a professional and friendly manner to ask what it was specifically that she wanted done.

Mr. Graves, being a professional and morally guided person, maintained to respect the organizational hierarchy, and perform his duties as grant accountant to the best of his abilities, and perform according to his supervisor's will, despite the extreme lack of clear communication and hostility.

Should you require any additional information, please feel free to contact me at 505-467-9955.

Warm regards,

Melody Bernal

505-467-9955

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**El Paso Area Office**
100 N. Stanton Street, Suite 600
El Paso, TX 79901
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/12/2024

**To:** Jordan Graves
4826 Calle Bella Ave
Las Cruces, NM 88012

Charge No: 543-2024-01007

EEOC Representative and email:     Erica Salas
Investigator
erica.salas@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 543-2024-01007.

On behalf of the Commission,

Digitally Signed By: Elizabeth Porras
07/12/2024

Elizabeth Porras
Area Office Director